UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

DIORIS FEO MOLINA RODRIGUEZ,                    :

      Plaintiff,                    :                    15 Civ. 8390 (AJP)

    -against-                    :                    **OPINION AND ORDER**

CAROLYN W. COLVIN, Commissioner of            :
Social Security,
             :
      Defendant.
             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ANDREW J. PECK, United States Magistrate Judge:**

    Pro se plaintiff Dioris Feo Molina Rodriguez brings this action pursuant to § 205(g)

of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner

of Social Security denying him Disability Insurance Benefits ("DIB").  (Dkt. No. 2: Compl.)

Presently before the Court is the Commissioner's motion for judgment on the pleadings pursuant to

Fed. R. Civ. P. 12(c). (Dkt. No. 13: Comm'r Notice of Mot.)  The parties have consented to decision

of the case by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Dkt. No. 10.)

Rodriguez did not reply to the Commissioner's motion and his time to do so has passed.  (See Dkt.

No. 5: 10/28/15 Scheduling Order.)

    For the reasons set forth below, the Commissioner's motion for judgment on the

pleadings (Dkt. No. 13) is GRANTED.

## FACTS

### Procedural Background

    Rodriguez protectively filed for DIB on April 23, 2013, alleging disability since

August 1, 2008.  (Dkt. No. 12: Administrative Record ("R.") 150.)  The Social Security Administration ("SSA") denied Rodriguez' application on July 10, 2012.  (R. 66-70.)  On July 2, 2013, Rodriguez had a hearing before Administrative Law Judge ("ALJ") Zachary S. Weiss.  (R. 48-52.)  ALJ Weiss postponed the hearing to allow Rodriguez to obtain counsel.  (R. 50-51.)  On December 20, 2013, Rodriguez again appeared unrepresented, and had a hearing before ALJ Weiss, at which an interpreter was provided.  (R. 53-63.)  On April 25, 2014, ALJ Weiss issued a written decision finding Rodriguez not disabled.  (R. 9-21.)  ALJ Weiss' decision became the Commissioner's final decision when the Appeals Council denied review on August 26, 2015.  (R. 1-4.)

## Non-Medical Evidence and Testimony

Rodriguez, born on July 11, 1965, was forty-three years old at the alleged August 1, 2008 onset of his disability.  (R. 28.)  Rodriguez finished high school in the Dominican Republic but did not graduate.  (R. 36.)  He moved to the United States in the 1990s.  (R. 38.)  Although Rodriguez indicated in his application for benefits that he is not able to speak, understand, read or write more than his name in English (R. 153), he testified before ALJ Weiss that he learned English in the United States by talking to people, and is "[m]ore or less" able to read and write in English.  (R. 61.)  Rodriguez does not have difficulty sitting (R. 60) or paying attention (R. 62).  During the day, Rodriguez watches Spanish language television programs and uses the computer.  (R. 61.)  Rodriguez also goes to the barbershop and spends time with friends, and goes to the mall with his wife.   (R. 62.)

Beginning in 2010, Rodriguez drove a taxi six days per week, six to seven hours a day.  (R. 57, 59.)  Rodriguez stopped driving because of his heart problem and worsening diabetes, and because "it was a rented car and money wasn't coming in that much."  (R. 58, 59.)  Previously,

3

Rodriguez worked as a parking attendant for seventeen years.  (R. 57.)  As a parking attendant, Rodriguez walked for three hours per day, stood for two hours per day and sat for three hours per day. (R. 155-56.) Currently, Rodriguez' wife supports him with help from their three adult children. (R. 60-61.)

Rodriguez has high blood pressure, diabetes, excessive weight loss, dizziness and back pain.  (R. 154.)  Rodriguez had a heart attack and cardiac catheterization in July 2013, and since then has seen a doctor every three months.  (R. 56.)  Rodriguez' doctor advised him that he could have another heart attack, and as a result he has "gotten scared" with his life.  (R. 59.) Although Rodriguez' doctor recommended that he walk daily for exercise, working his way up to walking a mile, Rodriguez stopped trying because "[t]hings . . . happen in life."  (R. 59-60.) Rodriguez' doctor also advised that he not lift more than twenty-five pounds.  (R. 60.)

**Medical Evidence Before the ALJ**

**Primary Care Physician Dr. Bienvenido Fajardo**

Dr. Fajardo has treated Rodriguez since 2004.  (R. 731.)  Between 2004 and 2008, Rodriguez regularly saw Dr. Fajardo for evaluations of his type two diabetes mellitus and hyperlipidemia.[1/]   (R. 698, 715, 716, 718-21, 723-27, 731.)  Dr. Fajardo repeatedly noted that Rodriguez reported "feeling well."  (R. 715, 716, 724.)

On May 4, 2010, Rodriguez saw Dr. Fajardo for evaluation of his hypertension and diabetes.  (R. 684.)  Dr. Fajardo diagnosed uncontrolled diabetes mellitus, hyperlipidemia,

---

[1/]     "Hyperlipidemia" is "a general term for elevated concentrations of any or all of the lipids in the plasma."  Dorland's Illustrated Medical Dictionary at 903 (31st ed. 2007).

hypertension and leukocytosis.[2/]  (R. 686.)  Dr. Farjardo recommended that Rodriguez continue his medication and cease smoking.  (Id.)

At Rodriguez' annual physical examination on March 2, 2011, Dr. Fajardo diagnosed diabetes mellitus type two, hypertension and smokers cough.  (R. 652-53.)  Dr. Farjardo opined that Rodriguez was in a "good general state of health," with no neck, backache, or shoulder pain, and respiratory system clear to auscultation bilaterally, with no wheezes, rhonchi[3/] or rales.[4/]  (R. 652-53.)  To treat Rodriguez' diabetes, Dr. Farjardo prescribed Glipizide, Ramipril, Metformin and Simvastatin (R. 653), and further recommended that Rodriguez eat a diet low in carbohydrates, cholesterol and salt (R. 655).

At a January 24, 2012 follow-up appointment, Dr. Fajardo diagnosed hypertension, diabetes mellitus type two, smokers cough and anxiety.  (R. 657-58.)  Rodriguez had seen Dr. Pavel, who changed his medication to Janumet, and Rodriguez had attempted to quit smoking, but continued to smoke because he was anxious.  (R. 657.)

At Rodriguez' annual physical examination on September 25, 2012, Dr. Farjardo noted that Rodriguez was "feeling well [and] in nad," i.e., no acute distress.  (R. 660.)  On examination, Rodriguez' respiratory system was clear to auscultation bilaterally, with no wheezes, rhonchi or rales.  (R. 661.)  Rodriguez reported smoking 21-30 cigarettes per day and was "[n]ot

---

[2/]     "Leucocytosis" is "a transient increase in the number of leukocytes in the blood."  Dorland's Illustrated Medical Dictionary at 1043.

[3/]     "Rhonchi" are continuous dry, low-pitched, snore-like noises from the throat or bronchial tube due to partial obstructions, such as from secretions.  Dorland's Illustrated Medical Dictionary at 1667.

[4/]     A "rale" is a discontinuous sound heard primarily during inhalation.  Dorland's Illustrated Medical Dictionary at 1600.

ready to quit." (R. 660.)  Dr. Fajardo assessed controlled hypertension, diabetes mellitus and smokers cough.  (R. 661.)  Dr. Fajardo counseled Rodriguez on the importance of smoking cessation, and a low carbohydrate, cholesterol and salt diet.  (R. 663.)

At an April 30, 2013 follow up appointment, Rodriguez complained of fatigue, and cramps in his upper right extremity "when driving too much," but otherwise no acute distress.  (R. 664.)  Rodriguez' respiratory exam indicated scattered rhonchi.  (R. 665.)  Dr. Fajardo assessed controlled hypertension, diabetes mellitus, hyperlipidemia, cramp in limb, smokers cough and a body mass index between nineteen and twenty-four. (R. 665.) Dr. Fajardo prescribed Lisinopril and Simvastatin to treat hypertension, Chantix for smoking cessation, and referred Rodriguez for a chest x-ray.  (R. 665-66.)

At Rodriguez' annual physical examination on September 16, 2013, he denied chest pain and reported "feeling well" in no acute distress.  (R. 667.)  Rodriguez continued to smoke twenty-one to thirty cigarettes per day.  (R. 667.)  On examination, Rodriguez' respiratory system was clear to auscultation bilaterally, with no wheezes, rhonchi or rales.  (R. 668.) Dr. Fajardo again assessed controlled hypertension, diabetes mellitus, hyperlipidemia, and a body mass index between nineteen and twenty-four, as well as chest pain and tobacco use disorder.  (R. 668.)  Dr. Fajardo prescribed a glucometer and test strips to monitor Rodriguez' diabetes, and a nicoderm patch for his tobacco use disorder.  (R. 668.)

At a follow up appointment on November 27, 2013, Rodriguez complained of anterior chest right side discomfort.  (R. 673.)  Dr. Fajardo assessed the same conditions as on September 16, 2013, plus anxiety.  (R. 674.)  Dr. Fajardo prescribed Busiprone for anxiety, and referred Rodriguez to a cardiologist for an electrocardiograph.  (R. 675.)

**Jacobi Medical Center**

On April 12, 2011, Rodriguez was admitted to the emergency room at Jacobi Medical Center for chest pain. (R. 175.) Rodriguez was ambulatory with a steady gait, unlabored breathing, lungs clear to auscultation bilaterally, and was in "no acute distress." (R. 175, 365.) Attending physician Dr. Paul Gennis opined that Rodriguez had "mild thickening of the right horizontal fissure, likely postinflammatory." (R. 354.) Rodriguez' cardiac silhouette was normal in size, his osseous structures appeared unremarkable, and he had no pleural effusions, vascular congestion, or visible infiltrate. (Id.)

On July 13, 2013, Rodriguez again was admitted to the Jacobi emergency room for complaints of chest pain, which he reported as intermittent for three days, and radiating from his mid-chest to his left side upper back. (R. 326.) Rodriguez rated his chest pain as seven out of ten. (R. 486.) Dr. Jay Meisner diagnosed an acute myocardial infarction, unspecified site. (R. 548.) A chest radiograph showed no evident acute abnormality. (R. 551.) Dr. Meisner summarized Rodriguez' echocardiogram as follows: "[l]eft ventricle: [s]mall area of basal inferior hypokinesis[;] [s]ystolic function was normal[;] [e]jection fraction was estimated to be 65%[;] [w]all thickness was at the upper limits of normal." (R. 557.) Rodriguez' left atrium size, left ventricular size and diastolic function parameters were normal. (R. 555-56.) Rodriguez' hospital admission notes indicated that he was a taxi-driver. (R. 473.)

On July 15, 2013, Rodriguez was transferred from Jacobi Medical Center to Montefiore Hospital for a cardiac catheterization. (R. 204.) Upon examination, Rodriguez' respiratory pattern, heart rate, heart rhythm and dorsalis pedis pulse were normal. (R. 204.)

Rodriguez' echocardiogram revealed a small area of basal-inferior hypokinesis.[5] (R. 214.) A stent was placed in Rodriguez' right coronary artery and he tolerated the procedure well. (R. 216.) Rodriguez was prescribed Metoprolol, aspirin, Lisinopril, Lipitor and Plavix. (R. 206-07.) Rodriguez was discharged on July 16, 2013 with instructions to avoid heavy lifting for seven days, and to eat a reduced fat and reduced sodium diet. (R. 206-07.)

On August 28, 2013, Rodriguez again went to the emergency room with complaints of three days of chest pain. (R. 296-97.) Rodriguez reported that he just returned from the Dominican Republic and had not taken diabetic or cardiac medication for four days. (R. 297, 454.) Rodriguez described his chest pain as intermittent pressure radiating to his right shoulder and lasting several minutes. (R. 389.) On examination, Rodriguez' chest had bilateral clear breath sounds, some rhonchi, and no crackles or wheeze. (R. 379-80.) Rodriguez' electrocardiogram showed "inferior Q waves and [was] without new ischemic changes." (R. 372.) Dr. Valerie Jorge Cabrera opined that Rodriguez' physical exam was unremarkable, with no evidence of "an acute cardio-ischemic event," "no compelling impression of [u]nstable [a]ngina" or any "other acute insidious cardiovascular patholog[y]." (Id.) Dr. Jorge Cabrera noted that the nature of Rodriguez' chest discomfort "remains elusive" but that given his "impressive cardiovascular risk factors, acute monitoring is indicated." (Id.) Rodriguez' admission notes again indicated that he was a taxi driver. (R. 379.)

Rodriguez spent the night of August 28, 2013 at the hospital. (R. 368.) On August 29, 2013, Dr. Lorena Gonzales-Stark found that Rodriguez was in no acute distress, and on "re-interrogation" stated that his "chest pain was only on Sunday and lasted for about an hour when he was smoking." (R. 368.) Rodriguez was discharged and told he could resume the same activity

---

[5]      "Hypokensis" is "abnormally decreased mobility." Dorland's Illustrated Medical Dictionary at 915.

level as before his hospitalization.  (R. 381, 383.)

On September 18, 2013, Rodriguez saw Dr. Rasha Al-Bawardy at the Jacobi cardiology clinic for a follow up.  (R. 347.)  Dr. Al-Bawardy noted that Rodriguez was "overall doing well, very functional and asymptomatic."  (R. 347.)  Rodriguez denied experiencing chest pain, shortness of breath, palpitations, lightheadedness or syncope.  (R. 347.)  Dr. Al-Bawardy diagnosed coronary atherosclerosis.[6]  (R. 348.)  Dr. Al-Bawardy emphasized the importance of medication compliance and smoking cessation, indicated that Rodriguez should continue his current medications (ASA, Plavix, Lisinopril, Metoprolol, Lipitor and Janumet), and noted that his primary physician could manage his cholesterol.  (R. 347.)

At a follow up appointment with Dr. Al-Bawardy on December 4, 2013, Rodriguez again denied experiencing chest pain, shortness of breath, palpitations, lightheadedness or syncope.  (R. 349.)  Dr. Al-Bawardy opined that Rodriguez had "[g]ood functional capacity" and noted that he "[t]akes his medications regularly" and was working on smoking cessation.  (R. 349.)  Dr. Al-Bawardy indicated that Rodriguez should continue his current medications, and manage his cholesterol through his primary physician.  (R. 349.)  Dr. Al-Bawardy again diagnosed coronary atherosclerosis, as well as acute myocardial infarction, unspecified site.  (R. 350.)

**Dr. John Fkiaras**

Consultative physician Dr. John Fkiaras examined Rodriguez on June 26, 2012.  (R. 188.)  Rodriguez reported fatigue, dizziness and blurred vision related to his diabetes.  (Id.) Rodriguez complained of sharp, non-radiating low back pain occurring three times per week, that

---

[6]     "Atherosclerosis" is "a common form of arteriosclerosis with formation of deposits of yellowish plaques (atheromas) containing cholesterol, lipoid material, and lipophages in the intima and inner media of large and medium-sized arteries."  Dorland's Illustrated Medical Dictionary at 174.

he rated as a seven to eight out of ten.  (Id.)  Rodriguez stated that his back pain was exacerbated by bending and lifting more than fifty pounds, and mitigated by rest.  (Id.) Rodriguez reported that his wife performed all of the cooking, cleaning, laundry and shopping for their household.  (R. 189.)

Upon examination, Rodriguez' uncorrected vision with both eyes was 20/25.  (R. 189.)  Rodriguez' gait and stance were normal, he used no assistive devices, he could walk on his heels and toes without difficulty, and he needed no help getting on and off the exam table.  (Id.)  Rodriguez' chest and lung examination revealed normal AP diameter, lungs clear to auscultation, and normal percussion and diaphragmatic motion with no significant chest wall abnormality.  (R. 190.)  Rodriguez' heart had regular rhythm and no audible murmur, gallop or rub.  (Id.)  Rodriguez' deep tendon reflexes were physiologic and equal in his upper and lower extremities, and Dr. Fkiaras found no sensory deficit.  (Id.)  Rodriguez' cervical spine and lumbar spine showed full flexion, extension, lateral flexion bilaterally and full rotary movement bilaterally, and his thoracic spine showed "[n]o scoliosis, kyphosis, or abnormality."  (Id.)  Rodriguez' joints were stable and nontender, and he had no redness, heat, swelling or effusions.  (Id.)

Dr. Fkiaras diagnosed diabetes, low back pain and hypertension (R. 190), and  noted that Rodriguez had a mild limitation for tasks that required sustained concentration secondary to diabetes (R. 191).  Dr. Fkiaras opined that Rodriguez' prognosis was fair.  (R. 190.)

**Dr. Leonard M. Rubin**

On March 9, 2014, medical expert Dr. Leonard M. Rubin reviewed the evidence of record.  (R. 734-42.)  Dr. Rubin opined that Rodriguez could frequently lift and carry up to ten pounds, occasionally lift and carry eleven to fifty pounds, and never lift or carry more than fifty pounds.  (R. 734.)  Dr. Rubin further opined that Rodriguez could sit for eight hours without interruption, and stand or walk for two hours without interruption.  (R. 735.)  In an eight hour work

day, Rodriguez could stand for four hours, walk for three hours and sit for eight hours.  (Id.)  Dr. Rubin indicated that Rodriguez could continuously reach, handle, finger, and feel, and could occasionally push, pull and operate foot controls.  (R. 736.)  Dr. Rubin stated that Rodriguez could balance frequently, and occasionally could climb stairs, ramps, ladders and scaffolds, stoop, kneel, crouch and crawl.  (R. 737.)  Dr. Rubin opined that due to Rodriguez' "'brittle' diabetes with swings in blood glucose," he could tolerate unprotected heights, moving mechanical parts or operating a motor vehicle only occasionally, but frequently could tolerate exposure to humidity, wetness, extreme heat or cold, and vibrations.  (R. 738.)  Dr. Rubin found that Rodriguez could shop, travel independently, ambulate without assistive devices, walk at a reasonable pace on rough or uneven surfaces, use public transportation, climb stairs, prepare meals, care for his personal hygeine and sort, handle and use files.  (R. 739.)

Based on the evidence, Dr. Rubin found that Rodriguez' impairments were diabetes mellitus, arteriosclerotic heart disease with balloon angioplasty, low back pain ("cause not established by imaging"), hyperlipidemia and essential hypertension.  (R. 740.)  Dr. Rubin concluded that none of Rodriguez' impairments met or equaled a listed impairment (R. 742), and noted that his diabetes was poorly controlled, perhaps due to poor dietary or medication compliance, and his back pain was not associated with positive straight leg raising tests.  (R. 741.)  Dr. Rubin stated that Rodriguez "should be able to function normally in most vocational activities."  (R. 741.)

**ALJ Weiss' Decision**

On April 25, 2014, ALJ Weiss denied Rodriguez' application for benefits.  (R. 9-21.) ALJ Weiss applied the appropriate five step legal analysis.  (R. 15-16.)  First, ALJ Weiss  found that Rodriguez "did not engage in substantial gainful activity during the period from his alleged onset date of August 1, 2008, through his date last insured of December 31, 2013."  (R. 17.)  Second, ALJ

Weiss found that Rodriguez had the following severe impairments: status post heart repair and diabetes.  (R. 17.)   Third, ALJ Weiss found that Rodriguez did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.  (R. 17-18.)  ALJ Weiss determined that Rodriguez had the residual function capacity ("RFC") to

> perform light work as defined in 20 CFR 404.1567(b) except occasionally climb ramps, stairs, ladders and scaffolds, stoop, kneel, crouch, crawl, push, pull, and operate foot control bilaterally, and occasionally be exposed to unprotected heights, moving mechanical parts and operating motor vehicles.

(R. 18.)

In making this determination ALJ Weiss considered Rodriguez' records  from Jacobi Medical Center, finding that his ventricular ejection fraction was "well within normal limits" and that the "medical signs of [his] end organs did not show any serious [diabetes-related] damage." (R. 18-19.)  ALJ Weiss gave "moderate weight" to the opinion of consultative physician Dr. Fkiaras, because it was "consistent with the medical signs from his examination, which showed essentially no physical reduction in function." (R. 19.)  ALJ Weiss accorded substantial weight to the opinion of medical expert Dr. Rubin, "because he was able to review the entire medical record and because his opinion is well supported by the medical record as a whole, which recorded no serious physical limitations after [Rodriguez'] heart catheterization except for subjective complaints of fatigue and dizziness from diabetes."  (Id.)

ALJ Weiss determined that Rodriguez' "statements concerning the intensity, persistence and limiting effects of [his] symptoms," including dizziness, fatigue, high blood pressure, back problems and excessive weight loss, were "not entirely credible." (R. 18.)  ALJ Weiss supported his credibility determination with Rodriguez' essentially normal medical examinations.  (R. 18-19.)

At the fourth step, ALJ Weiss determined that Rodriguez' restriction to occasional operation of motor vehicles precluded his past relevant work as a parking-lot attendant, but given his "age, education, work experience and residual functional capacity," jobs "existed in significant numbers in the national economy" that he could perform.  (R. 19-20.)  ALJ Weiss noted that Rodriguez is considered a younger individual, with unskilled prior work experience, who because he is unable to communicate in English, "is considered in the same way as an individual who is illiterate in English."  (R. 20.)  ALJ Weiss relied on Rule 202.16 of the Grid.  (Id.)  Accordingly, ALJ Weiss concluded that Rodriguez was not "under a disability, as defined in the Social Security Act, at any time from August 1, 2008, the alleged onset date, through December 31, 2013, the date last insured." (Id.)

## ANALYSIS

## I.     THE APPLICABLE LAW

### A.     Definition Of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[7]

---

[7]     See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, (continued...)

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270.[8/]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[9/]

### B.   Standard Of Review

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination. E.g.,

---

[7/]   (...continued)
16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

[8/]   See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472; Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[9/]   See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62.

42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011).[10/]  "'Thus, the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision.'"  Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[11/]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[12/]  "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence."  Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983).  The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if

---

[10/]   See also, e.g., Prince v. Astrue, 514 F. App'x 18, 19 (2d Cir. 2013); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

[11/]   See also, e.g., Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[12/]   See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949

F.2d 57, 59 (2d Cir. 1991).[13/]

      The Court, however, will not defer to the Commissioner's determination if it is "'the

product of legal error.'" E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y.

Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir.

2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101

(2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

      The Commissioner's regulations set forth a five-step sequence to be used in

evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540

U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct.

2287, 2291 (1987). The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability. If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further. [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

---

[13/]    See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted).[14/]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training. See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[15/]

"When, as here, the claimant appears before the ALJ pro se and is unable to speak English well, reviewing courts have a heightened duty to 'make a searching investigation of the record' to make certain the claimant's rights have been protected." Duran v. Barnhart, 01 Civ. 8307, 2003 WL 103003 at *7 (S.D.N.Y. Jan. 13, 2003) (quoting Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990)).

## II.   APPLICATION OF THE FIVE STEP SEQUENCE

### A.   Rodriguez Was Not Engaged In Substantial Gainful Activity

The first inquiry is whether Rodriguez was engaged in substantial gainful activity after his application for DIB. "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510. ALJ Weiss' conclusion that Rodriguez did not engage in substantial gainful

---

[14/]   Accord, e.g., Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774; see also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

[15/]   See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

activity during the applicable time period (see page 10 above) is not disputed.  (See generally Dkt. No. 14: Comm'r Br.)  The Court therefore proceeds with the analysis.

**B.      Rodriguez Demonstrated "Severe" Impairments That Significantly Limited His Ability To Do Basic Work Activities**

The second step of the analysis is to determine whether Rodriguez proved that he had a severe impairment or combination of impairments that "significantly limit[ed his] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b).  "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b)(1)-(6).

ALJ Weiss determined that Rodriguez' severe impairments were diabetes and status post heart repair.  (See page 11 above.)  ALJ Weiss further determined that Rodriguez' back pain was non-severe because "there are no laboratory findings of a back impairment to reasonably explain his reports of pain."  (R. 17.)  ALJ Weiss' finding regarding Rodriguez' back pain was supported by substantial evidence (see pages 18-20 below), and his additional findings regarding the severity of Rodriguez' impairments benefit Rodriguez.  Accordingly, the Court proceeds to the third step of the five-part analysis.

**C.      Rodriguez Did Not Have A Disability Listed In Appendix 1 Of The Regulations**

The third step of the five-step test requires a determination of whether Rodriguez had an impairment listed in Appendix 1 of the Regulations.  20 C.F.R., Pt. 404, Subpt. P, App. 1.  "These

are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits."  <u>Dixon</u> v. <u>Shalala</u>, 54 F.3d 1019, 1022 (2d Cir. 1995).

ALJ Weiss found that notwithstanding Rodriguez' severe impairments, he "did not have an impairment or combination of impairments that met or medically equalled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)."  (R. 17.)

ALJ Weiss assessed the medical evidence in the record pursuant to listings 1.04 (disorders of the spine), 4.02 (chronic heart failure), and 9.00(B)(5) (endocrine disorders).  (R. 18; <u>see</u> 20 C.F.R., Part 404, Subpart P, App. 1, §§ 1.04, 4.02, 9.00(B)(5).)

For a disorder of the spine to be considered severe it must result "in compromise of a nerve root (including the cauda equina) or the spinal cord" with:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R.  Pt. 404, Subpt. P, App. 1, § 1.04.

ALJ Weiss' finding that Rodriguez' back pain did not meet or equal a listed

impairment is supported by Dr. Fkiaras' examination of Rodriguez, which showed full motion in his spine, and neither sensory nor reflex loss (see page 9 above), as is required to satisfy listing 1.04(A). There is no operative note, pathology report of tissue biopsy, or appropriate medically acceptable imaging in the record to support a finding of spinal arachnoiditis as is required to satisfy listing 1.04(B).  Listing 1.04(C) requires an inability to ambulate effectively.

> Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R.  Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1).  Rodriguez' ability to ambulate effectively is demonstrated by his activities of daily living, which include going to the mall and barbershop (see page 2 above); by his doctor's advice that he should walk a mile every day for exercise (see page 3 above); and by the fact that he does not use an assistive device (see page 9 above).  Thus, Rodriguez' back pain does not satisfy the requirements of listing 1.04(C).

Finally, years of treatment notes from Rodriguez' treating physician Dr. Fajardo do not reflect complaints of back pain, or back-related testing or diagnoses.  (See pages 3-5 above.) Simply put, there is no evidence in the record to support a finding that Rodriguez' suffered from a disabling spine disorder.  ALJ Weiss was entitled to rely on that absence of evidence.  See, e.g., Salvaggio v. Apfel, 23 F. App'x 49, 51 (2d Cir. 2001) (lack of medical evidence supports the ALJ's determination that plaintiff was not disabled); O'Connor v. Shalala, No. 96-6215, 111 F.3d 123 (table), 1997 WL 165381 at *1 (2d Cir. Mar. 31, 1997) ("the Commissioner is also entitled to rely on the absence of contemporaneous evidence of the disability"); Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995); Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983) (Commissioner is "entitled

to rely not only on what the [medical] record says, but also on what it does not say"); <u>Soto</u> v. <u>Colvin</u>, 14 Civ. 7440, 2015 WL 1726541 at *19 (S.D.N.Y. Apr. 14, 2015) (Peck, M.J.) (The ALJ "was entitled to rely on that absence of evidence"); <u>Johnston</u> v. <u>Colvin</u>, 13 Civ. 2710, 2015 WL 657774 at *5 n.3 (S.D.N.Y. Feb. 13, 2015) ("As the Second Circuit has noted, the absence of evidence from the claimed period of disability may itself be considered substantial evidence."), <u>R. & R. adopted</u>, 2015 WL 1266895 (S.D.N.Y. Mar. 18, 2015).[16/]

        For chronic heart failure to be considered severe under Appendix 1 of the regulations there must be:

> A. Medically documented presence of one of the following:
>
> 1. Systolic failure (see 4.00D1a(i)), with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or
>
> 2. Diastolic failure (see 4.00D1a(ii)), with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure);
>
> AND
>
> B. Resulting in one of the following . . . .

20 C.F.R.  Pt. 404, Subpt. P, App. 1, § 4.02.

---

16/      <u>See also</u>, <u>e.g.</u>, <u>Marte</u> v. <u>Colvin</u>, 14 Civ. 0832, 2014 WL 5088078 at *18 (S.D.N.Y. Oct. 9, 2014) (Peck, M.J.); <u>Rodriguez</u> v. <u>Barnhart</u>, 04 Civ. 4514, 2005 WL 643190 at *12 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); <u>Catrain</u> v. <u>Barnhart</u>, 325 F. Supp. 2d 183, 192 (E.D.N.Y. 2004) ("[T]he ALJ is entitled to rely on the absence of opinions. . . ."); <u>Jiang</u> v. <u>Barnhart</u>, 03 Civ. 0077, 2003 WL 21526937 at *13 (S.D.N.Y. July 8, 2003) (Peck, M.J.), <u>R. & R. adopted</u>, 2003 WL 21755932 (S.D.N.Y. July 30, 2003); <u>De Roman</u> v. <u>Barnhart</u>, 03 Civ. 0075, 2003 WL 21511160 at *13 (S.D.N.Y. July 2, 2003) (Peck, M.J.); <u>Alvarez</u> v. <u>Barnhart</u>, 02 Civ. 3121, 2002 WL 31663570 at *10 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.), <u>R. & R. adopted</u>, 2003 WL 272063 (S.D.N.Y. Jan. 16, 2003); <u>De La Cruz</u> v. <u>Chater</u>, 937 F. Supp. 194, 197 (E.D.N.Y. 1996).

At Rodriguez' July 13, 2013 echocardiogram, his ejection fraction was estimated to be 65%, and his left ventricular size and diastolic function parameters were normal (see page 6 above), precluding a finding of systolic failure under listing 4.02(A)(1).  Further, Rodriguez' left ventricular wall thickness was "at the upper limits of normal" and his left atrium size was normal (see page 6 above), precluding a finding of diastolic failure under listing 4.02(A)(2).  As Rodriguez cardiovascular impairment does not meet the paragraph A requirements of listing 4.02, there was no need for ALJ Weiss to consider the paragraph B requirements.  ALJ Weiss' finding that Rodriguez does not have a disabling heart impairment thus is supported by substantial evidence.

For diabetes mellitus to be considered severe under Appendix 1 of the regulations it must be accompanied by hyperglycemia, diabetic ketoacidosis, chronic hyperglycemia or hypoglycemia.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 9.00(B)(5).  There is no medical evidence indicating that Rodriguez' diabetes is accompanied by any of these conditions.  (See pages 3-10 above.)  ALJ Weiss was entitled to rely on the absence of evidence.  See, e.g., cases cited at pages 19-20 & n.16 above.

Accordingly, ALJ Weiss' finding that Rodriguez did not have a listed disability based on his back pain, heart condition, or diabetes mellitus is supported by substantial evidence.

Before proceeding to step four, the Court will address ALJ Weiss' credibility and residual functional capacity determinations.

### 1.   Credibility Determination

Because subjective symptoms only lessen a claimant's RFC where the symptoms "'can reasonably be accepted as consistent with the objective medical evidence and other evidence,' the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence."  Moulding v. Astrue, 08 Civ. 9824, 2009 WL

3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted); see, e.g., Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) ("As for the ALJ's credibility determination, while an ALJ 'is required to take the claimant's reports of pain and other limitations into account,' he or she is 'not require[d] to accept the claimant's subjective complaints without question.'  Rather, the ALJ 'may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'" (citations omitted)); Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) ("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." (citations omitted)); Brown v. Comm'r of Soc. Sec., 310 F. App'x 450, 451 (2d Cir. 2009) ("'Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings.'").[17/]  In addition, "courts must show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor

---

[17/]    See also, e.g., Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) (same); Thompson v. Barnhart, 75 F. App'x 842, 845 (2d Cir. 2003) (ALJ properly found that plaintiff's "description of her symptoms was at odds with her treatment history, her medication regime, and her daily routine"); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Norman v. Astrue, 912 F. Supp. 2d 33, 85 (S.D.N.Y. 2012) ("It is 'within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology.'"); Astolos v. Astrue, No. 06-CV-678, 2009 WL 3333234 at *12 (W.D.N.Y. Oct. 14, 2009) (ALJ properly determined that plaintiff's subjective pain complaints were not supported by the medical record); Speruggia v. Astrue, No. 05-CV-3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26, 2008) ("The ALJ 'does not have to accept plaintiff's subjective testimony about her symptoms without question' and should determine a plaintiff's credibility 'in light of all the evidence.'"); Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of pain alleged by the claimant."); Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

while [the plaintiff was] testifying."  Marquez v. Colvin, 12 Civ. 6819, 2013 WL 5568718 at *7 (S.D.N.Y. Oct. 9, 2013).[18/]

ALJ Weiss determined that Rodriguez' "medically determinable ailments could reasonably be expected to cause the alleged symptoms," but his" statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible . . . ."  (R. 18.)

When ruling that a claimant is not entirely credible, the ALJ must provide "specific reasons for the finding on credibility, supported by the evidence in the case record."  SSR 96-7p, 1996 WL 374186 at *4 (July 2, 1996).  The regulations set out a two-step process for assessing a claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . .  If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record.  The ALJ must consider statements the claimant or others make about his impairment(s), his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

Genier v. Astrue, 606 F.3d at 49 (quotations, citation & brackets omitted).[19/]

---

[18/]  Accord, e.g., Campbell v. Astrue, 465 F. App'x at 7 ("[W]e have long held that '[i]t is the function of the [Commissioner], not ourselves, . . . to appraise the credibility of witnesses, including the claimant.'"); Nunez v. Astrue, 11 Civ. 8711, 2013 WL 3753421 at *7 (S.D.N.Y. July 17, 2013); Guzman v. Astrue, 09 Civ. 3928, 2011 WL 666194 at *7 (S.D.N.Y. Feb. 4, 2011); Ruiz v. Barnhart, 03 Civ. 10128, 2006 WL 1273832 at *7 (S.D.N.Y. May 10, 2006); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y. 1995); Mejias v. Soc. Sec. Admin., 445 F. Supp. 741, 744 (S.D.N.Y. 1978) (Weinfeld, D.J.); Wrennick v. Sec'y of Health, Educ. & Welfare, 441 F. Supp. 482, 485 (S.D.N.Y. 1977) (Weinfeld D.J.).

[19/]  Accord, e.g., Cichocki v. Astrue, 534 F. App'x 71, 75-76 (2d Cir. 2013); Campbell v. Astrue, 465 F. App'x at 7; Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010); Taylor v. (continued...)

ALJ Weiss appropriately applied this two step process.  In assessing Rodriguez' subjective complaints, ALJ Weiss assigned moderate weight to Dr. Fkiaras' medical exam, which showed "essentially no physical reduction in function."  (See page 11 above.)  ALJ Weiss accorded significant weight to Dr. Rubin's opinion because it was consistent with "the medical record as a whole, which recorded no serious physical limitations after [Rodriguez'] heart catheterization." (See page 11 above.)  ALJ Weiss considered the objective medical evidence, and noted that although Rodriguez reported that high blood pressure, back problems and excessive weight loss limited his ability to work, his medical examinations were largely normal, and his body mass index indicated a healthy weight.  (R. 18-19.)  In addressing Rodriguez' complaints of diabetes-related dizziness and fatigue, ALJ Weiss reviewed his laboratory results, and noted that the "medical signs of [his] end organs did not show any serious [diabetes-related] damage."  (See page 11 above.)  Further, Dr. Al-Bawardy's opinion that Rodriguez was "overall doing well, very functional and asymptomatic" (see page 8 above), contradicts Rodriguez' complaints of disabling symptoms.

ALJ Weiss' credibility determination likewise is supported by Rodriguez' September 25, 2012 and September 16, 2013 reports to Dr. Fajardo that he was "feeling well" (see pages 4, 5 above), and by his August 28, 2013 discharge summary from Jacobi Medical Center, which instructed that he could return to normal levels of activity seven days after his release (see pages 7-8 above).

Thus, ALJ Weiss met his burden in finding Rodriguez' claims not entirely credible because the objective medical evidence and Rodriguez' own reports to his physician failed to support

---

[19/]    (...continued)
Barnhart, 83 F. App'x 347, 350-51 (2d Cir. 2003); 20 C.F.R. § 416.945(a)(1), (3); SSR 96-7p, 1996 WL 374186 at *2.

his claims of disability based primarily on dizziness, fatigue, back pain, excessive weight loss and high blood pressure.  See, e.g., Stanton v. Astrue, 370 F. App'x 231, 234 (2d Cir. 2010) (the court will not "second-guess the credibility finding . . . where the ALJ identified specific record-based reasons for his ruling"); Rutkowski v. Astrue, 368 F. App'x 226, 230 (2d Cir. 2010) (ALJ adequately supported credibility finding when he noted that "substantial evidence existed showing that [plaintiff] was relatively 'mobile and functional,' and that [plaintiff's] allegations of disability contradicted the broader evidence"); Duran v. Colvin, 14 Civ. 4681, 2015 WL 4476165 at *13 (S.D.N.Y. July 22, 2015) (Peck, M.J.) (the ALJ "met his burden in finding [plaintiff] not entirely credible because the objective medical evidence and her stated independence in activities of daily living failed to support her claims of disability"); Kessler v. Colvin, 48 F. Supp. 3d 578, 596 (S.D.N.Y. 2014) (claimant's "subjective complaints of pain lacked the necessary objective medical support, and therefore were not entitled to any special weight.  Accordingly, the ALJ's adverse credibility determination was not erroneous."); Givens v. Colvin, 13 Civ. 4763, 2014 WL 1394965 at *10-11 (S.D.N.Y. Apr. 11, 2014) (Peck, M.J.) (ALJ properly found claimant's disability claims not entirely credible where claimant "admitted that he was capable of performing many day-to-day activities, such as reading, watching television, caring for his personal needs, using public transportation, and going to church"); Hilliard v. Colvin, 13 Civ. 1942, 2013 WL 5863546 at *15 (S.D.N.Y. Oct. 31, 2013) (Peck, M.J.) (the ALJ "met his burden in finding [plaintiff's] claims not entirely credible because she remains functional in terms of activities of daily living and the objective medical evidence fails to support her claims of total disability based on pain" (citations omitted)); Ashby v. Astrue, 11 Civ. 2010, 2012 WL 2477595 at *15 (S.D.N.Y. Mar. 27, 2012) ("in making his credibility assessment, the ALJ appropriately considered Plaintiff's ability to engage in certain daily activities as one factor, among others suggested by the regulations"), R. & R. adopted,

2012 WL 2367034 (S.D.N.Y. June 20, 2012).

### 2.      Residual Functional Capacity Determination

ALJ Weiss found that Rodriguez had the RFC to "perform light work as defined in 20 CFR 404.1567(b) except occasionally climb ramps, stairs, ladders, and scaffolds, stoop, kneel, crouch, crawl, push, pull, and operate foot controls bilaterally, and occasionally be exposed to unprotected heights, moving mechanical parts and operating motor vehicles." (See page 11 above.) Light work

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

ALJ Weiss' RFC determination was based on his review of Rodriguez' testimony and the medical evidence, including Rodriguez' successful catheterization, good post-operative cardiac function, consistently regular heart rate and rhythm, and diabetes-related laboratory testing. (R. 18-19.) ALJ Weiss relied on Dr. Fkiaras' essentially normal examination findings, and his opinion that Rodriguez had only a "mild limitation" for tasks involving sustained concentration (see page 9 above), and his examination results demonstrating essentially "no physical reduction in function" (see page 11 above). ALJ Weiss assigned significant weight to Dr. Rubin's assessment that Rodriguez could frequently lift and carry up to ten pounds, occasionally lift and carry eleven to fifty pounds, stand for four hours, walk for three hours and sit for eight hours in a given work day, as well as continuously reach, handle, finger, and feel, and occasionally push, pull and operate foot controls

(see pages 9-10 above), all of which is consistent with a capacity to perform light work. Dr. Fkiaras' and Dr. Rubin's opinions are consistent with treating physician Dr. Fajardo's largely unremarkable treatment notes, and Dr. Al-Bawardy's notes from Rodriguez' post operative follow up appointments. (See pages 3-5 & 8 above.)  Finally, Rodriguez' testimony that he has no difficulty sitting or paying attention, and that his doctor recommended he not lift more than twenty-five pounds (see pages 2, 3 above), as well as his reports to medical professionals that he worked as a taxi driver (see pages 6, 7 above), all are consistent with a capacity to perform light work.

Accordingly, the Court finds that ALJ Weiss' RFC determination is supported by substantial evidence in the record.  See, e.g., Sizer v. Colvin, 592 F. App'x 46, 47 (2d Cir. 2015) (RFC determination "based on the medical opinion evidence, the objective medical evidence, and Appellant's testimony at the ALJ hearing" was supported by substantial evidence.); Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995) ("The opinions of three examining physicians, plaintiff's own testimony, and the medical tests together constitute substantial evidence adequately supporting the [Commissioner's] conclusion that plaintiff's injuries did not prevent her from resuming her job as a sewing machine operator."); Fuentes v. Colvin, No. 13-CV-6201, 2015 WL 631969 at *8 (W.D.N.Y. Feb. 13, 2015) ("'The opinion of a consultative examiner can constitute substantial evidence supporting an ALJ's decision.'").

### D.      Rodriguez Did Not Have The Ability to Perform His Past Relevant Work

The fourth step of the five-step analysis asks whether Rodriguez had the residual functional capacity to perform his past relevant work.  (See page 15 above.)  Rodriguez previously worked as a taxi driver and parking lot attendant.  (See page 2-3 above.)  ALJ Weiss concluded that Rodriguez' restriction to occasional operation of motor vehicles precluded him from continuing to work at these jobs.  (See page 12 above.)  Because this finding favors Rodriguez and is not contested

by the Commissioner (<u>see generally</u> Dkt. No. 14: Comm'r Br.), the Court proceeds to the fifth and final step of the analysis.

### E.    There Are Jobs In Substantial Numbers In The Economy That Rodriguez Can Perform

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his age, his education, his experience and his training." <u>Parker</u> v. <u>Harris</u>, 626 F.2d 225, 231 (2d Cir. 1980).[20]

In meeting her burden under the fifth step, the Commissioner:

> may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid". The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the Grid is dispositive on the issue of disability.

<u>Zorilla</u> v. <u>Chater</u>, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); <u>see</u>, <u>e.g.</u>, <u>Heckler</u> v. <u>Campbell</u>, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the promulgation of the Grid); <u>Roma</u> v. <u>Astrue</u>, 468 F. App'x at 20-21; <u>Martin</u> v. <u>Astrue</u>, 337 F. App'x 87, 90 (2d Cir. 2009); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 78; <u>Perez</u> v. <u>Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996); <u>Bapp</u> v. <u>Bowen</u>, 802 F.2d 601, 604 (2d Cir. 1986).

"Within the Second Circuit, the necessity for a vocational expert is determined on

---

[20]    <u>See</u>, <u>e.g.</u>, <u>Roma</u> v. <u>Astrue</u>, 468 F. App'x 16, 20 (2d Cir. 2012); <u>Arruda</u> v. <u>Comm'r of Soc. Sec.</u>, 363 F. App'x 93, 95 (2d Cir. 2010); <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d 377, 381 (2d Cir. 2004), <u>amended on other grounds</u>, 416 F.3d 101 (2d Cir. 2005); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999).

a case-by-case basis." <u>Matta</u> v. <u>Colvin</u>, 13 Civ. 5290, 2016 WL 524652 at *12 (S.D.N.Y. Feb. 8, 2016) (citing <u>Bapp</u> v. <u>Bowen</u>, 802 F.2d 601, 605 (2d Cir. 1986)).  However, "relying solely on the Grids is inappropriate when nonexertional limitations 'significantly diminish' plaintiff's ability to work so that the Grids do not particularly address plaintiff's limitations."  <u>Vargas</u> v. <u>Astrue</u>, 10 Civ. 6306, 2011 WL 2946371 at *13 (S.D.N.Y. July 20, 2011); <u>see also</u>, <u>e.g.</u>, <u>Travers</u> v. <u>Astrue</u>, 10 Civ. 8228, 2011 WL 5314402 at *10 (S.D.N.Y. Nov. 2, 2011) (Peck, M.J.), <u>R. & R. adopted</u>, 2013 WL 1955686 (S.D.N.Y. May 13, 2013); <u>Lomax</u> v. <u>Comm'r of Soc. Sec.</u>, No. 09-CV-1451, 2011 WL 2359360 at *3 (E.D.N.Y. June 6, 2011) ("Sole reliance on the grids is inappropriate, however, where a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations.'").

Rather, where the claimant's nonexertional limitations "'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert."  <u>Zabala</u> v. <u>Astrue</u>, 595 F.3d 402, 410 (2d Cir. 2010) (quoting <u>Bapp</u> v. <u>Bowen</u>, 802 F.2d at 605); <u>see also</u>, <u>e.g.</u>, <u>Selian</u> v. <u>Astrue</u>, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert."); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 82 ("Where significant nonexertional impairments are present at the fifth step in the disability analysis, however, 'application of the grids is inappropriate.'  Instead, the Commissioner 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'" (quoting & citing <u>Bapp</u> v. <u>Bowen</u>, 802 F.2d at 603, 605-06)); <u>Suarez</u> v. <u>Comm'r of Soc. Sec.</u>, No. 09-CV-338, 2010 WL 3322536 at *9 (E.D.N.Y. Aug. 20, 2010) ("If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ

is required to consult with a vocational expert." (quoting <u>Zabala</u> v. <u>Astrue</u>, 595 F.3d at 411)).

ALJ Weiss found that considering Rodriguez' "age, education, work experience, and residual functional capacity," jobs "existed in significant numbers in the national economy" that he could perform.  (<u>See</u> page 12 above.)  At forty-eight years old, Rodriguez is considered a younger individual under 20 C.F.R. Pt. 404, Subpt. P, App. 2, 201.00(h)(1).  Under Medical-Vocational Rule 202.16, Rodriguez' age, inability to communicate in English and prior unskilled work experience dictate a finding of "not disabled."  20 C.F.R. Pt. 404, Subpt. P, App. 2, 202.16.  ALJ Weiss noted that Rodriguez had "additional limitations" to his capacity to perform the full range of light work, but determined that these had "little or no effect on the occupational base of unskilled light work pursuant to SSR 85-15."  (R. 20.)

The evidence of record supports a finding that Rodriguez had a mild limitation to his ability to sustain concentration, as well as a limitations to occasionally climbing ramps, stairs, ladders, and scaffolds, stooping, kneeling, crouching, crawling, pushing, pulling and operating foot controls, and occasional exposure to unprotected heights, moving mechanical parts and operating motor vehicles.  (<u>See</u> pages 9-10 above.)  As set forth above, ALJ Weiss' finding that these limitations had little or no effect on Rodriguez' capacity to perform light work is supported by substantial evidence.  (<u>See</u> section II(C)(2) above; <u>see also</u>, <u>e.g.</u>, SSR 85-15, 1985 WL 56857 at *6-7 (where "a person has some limitation in climbing and balancing and it is the only limitation, it would not ordinarily have a significant impact on the broad world of work . . . .  If a person can stoop occasionally . . . in order to lift objects, the sedentary and light occupational base is virtually intact."); SSR 83-14, 1983 WL 31254 at *4-5 ("nonexertional limitations or restrictions which have very little or no effect on the unskilled light occupational base" include "inability to ascend or descend scaffolding, poles, and ropes; inability to crawl on hands and knees . . .").

Accordingly, ALJ Weiss' reliance on the Grids in finding Rodriguez "not disabled" was appropriate.  See, e.g., Santiago v. Colvin, 12 Civ. 7052, 2014 WL 718424 at *22 (S.D.N.Y. Feb. 25, 2014) (ALJ's reliance on the Grid was appropriate where the ALJ had concluded at step four that the claimant's "bipolar disorder did not significantly diminish his work capacity."), R. & R. adopted, 2014 WL 1092967 (S.D.N.Y. Mar. 17, 2014); Rosario v. Astrue, 12 Civ. 3594, 2013 WL 3324299 at *2, *6, *9 (S.D.N.Y. June 25, 2013) (ALJ's reliance on the Grid was appropriate where claimant had "mild limitations in walking distances due to fatigue, and mild limitations in prolonged standing, sitting, and climbing stairs due to back pain," as well as "moderate difficulties in concentration, persistence or pace"); Vargas v. Astrue, 10 Civ. 6306, 2011 WL 2946371 at *6, *12-13 (S.D.N.Y. July 20, 2011) (ALJ's reliance on the Grid was appropriate where claimant had "moderate limitations with lifting, carrying, handling objects, and climbing stairs," as well as "moderate limitations in maintaining attention and concentration for complex tasks").

## **CONCLUSION**

For the reasons set forth above, the Commissioner's determination that Rodriguez was not disabled within the meaning of the Social Security Act during the period from August 1, 2008 to December 31, 2013 is supported by substantial evidence.  Accordingly, the Commissioner's

32

motion for judgment on the pleadings (Dkt. No. 13) is <u>GRANTED</u>.  The Clerk of Court shall close

the case.

SO ORDERED.

Dated:        New York, New York
              March 25, 2015

_____
**Andrew J. Peck**
United States Magistrate Judge

Copies to:    Dioris Feo Molina Rodriguez (regular & certified mail)
              Counsel (ECF)